UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 10-80139-CR-RYSKAMP/HOPKINS

UNITED STATES OF AMERICA

vs.

CLIFFORD S. DAVIS,

      Defendant.
_____/

## PLEA AGREEMENT

The United States of America and CLIFFORD S. DAVIS (hereinafter referred to as the "defendant") enter into the following agreement:

1. The defendant agrees to plead guilty to Counts One and Two of the indictment. Count One which charges the defendant with bank robbery in violation of Title 18, United States Code, Sections 2113(a) and (d). Count Two charges the defendant with brandishing a fire arm during and in relation to a crime of violence to wit: Count One.

2. The defendant is aware that the sentence will be imposed by the court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the court relying in part on the results of a Pre-Sentence Investigation by the court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines.

The defendant is further aware and understands that the court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offense identified in paragraph 1 and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

3. For Count One the defendant also understands and acknowledges that the court may impose a statutory maximum term of imprisonment of up to 25 years, followed by a term of supervised release of 5 years. In addition to a term of imprisonment and supervised release, the court may impose a fine of up to $250,000.

For Count Two the defendant also understands and acknowledges that the court must impose a 7 year minimum mandatory term of imprisonment consecutive to any sentence imposed in Count One, followed by a term of 3 years supervised release. In addition to a term of imprisonment and supervised release, the court may impose a fine of up to $250,000.

4. The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $200 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

5. The Office of the United States Attorney for the Southern District of Florida (hereinafter "Office") reserves the right to inform the court and the probation office of all facts pertinent to the

sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this agreement, this Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

6. The United States agrees that it will recommend at sentencing that the court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant's offense level is determined to be 16 or greater, the government will make a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently. The United States, however, will not be required to make this motion if the defendant: (1) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

7. The defendant agrees that he shall cooperate fully with this Office by:

(a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews, before a grand jury, or at any trial or other court proceeding;

(b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required by this Office; and

(c) if requested by this Office, working in an undercover role to contact and negotiate with [sources of cocaine and other controlled substances, others suspected and believed to be involved in criminal misconduct] under the supervision of, and in compliance with, law enforcement officers and agents.

8. This Office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the defendant's cooperation, or lack thereof, known to the court at the time of sentencing. If in the sole and unreviewable judgment of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the court's downward departure from *the advisory sentence* calculated under the Sentencing Guidelines, this Office may at or before sentencing make a motion consistent with the intent of Section 5K1.1 of the Sentencing Guidelines prior to sentencing, or Rule 35 of the Federal Rules of Criminal Procedure subsequent to sentencing, reflecting that the defendant has provided substantial assistance and recommending that the defendant's sentence be reduced from the advisory sentence suggested by the Sentencing Guidelines. The defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require this Office to file any such motion(s) and that this Office's assessment of the nature, value, truthfulness, completeness, and accuracy of the

4

defendant's cooperation shall be binding insofar as the appropriateness of this Office's filing of any such motion is concerned.

9. The defendant understands and acknowledges that the Court is under no obligation to grant the motion(s) referred to in paragraph 6 of this agreement should the government exercise its discretion to file any such motion. The defendant also understands and acknowledges that the court is under no obligation to reduce the defendant's sentence because of the defendant's cooperation.

10. The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure and/or a variance from the guideline range that the court establishes at sentencing. The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b). However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that he has discussed the appeal waiver set forth in this agreement with his attorney. The defendant further agrees, together with the United States, to request that the district court enter a specific finding that the defendant's waiver of his right to appeal the sentence to be imposed in this case was knowing and voluntary.

11. The defendant is aware that the sentence has not yet been determined by the court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the

defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the court. The defendant understands further that any recommendation that the government makes to the court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the court and the court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

12. This is the entire agreement and understanding between the United States and the defendant. There are no other agreements, promises, representations, or understandings.

Date: 11/10/10

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By: *[signature]*
ROBERT H. WATERS, JR.
ASSISTANT UNITED STATES ATTORNEY

Date: 11/8/10

By: *[signature]*
FRANKLIN PRINCE
ATTORNEY FOR DEFENDANT

Date: 11/8/10

By: *[signature]*
CLIFFORD S. DAVIS
DEFENDANT

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 10-80139-CR-RYSKAMP/HOPKINS

UNITED STATES OF AMERICA

vs.

CLIFFORD S. DAVIS,

       Defendant.
_____/

## STIPULATED FACTUAL BASIS IN SUPPORT OF PLEA

Had this case gone to trial the United States would have proven the following facts:

On September 14, 2010, two unidentified persons entered the Chase Bank, located at 7700 South Dixie Highway, West Palm Beach, Florida. The two subjects entered the lobby of the bank. One subject opened the door of the bank while the second subject drove a black motorcycle into the lobby of the bank. Both subjects were armed and described by witnesses as wearing dark clothing and black motorcycle helmets with face shields. Once inside the lobby, the passenger forcibly grabbed the assistant bank manager, forcing her to open the door to the back area of the bank, leading into the vault. Once inside the back room, the assistant manager told another bank employee to open the vault. The bank employee opened the vault and removed two bags of U.S. currency. The subject threw a black backpack to the ground. The bank employees placed one bag of currency into the backpack. During the encounter in the vault, the subject was armed with what was described as a black, semi-automatic handgun. In addition, the subject struck both women and forcibly pushed them to the ground.

After obtaining approximately $144,000.00 in U.S. currency from the vault, both subjects fled the bank on the black motorcycle.

Chase Bank USA, NA, FDIC number 628 located at 7700 S. Dixie Highway, West Palm Beach, Florida is a financial institution whose deposits are insured by the Federal Deposit Insurance Corporation (FDIC).

A short distance from the bank, at the intersection of Southern Boulevard and the entrance ramp to Interstate 95, the subjects were involved in a vehicle crash when the black motorcycle collided with a truck. The two subjects then carjacked the driver of a 2005 green Toyota Corolla, bearing Florida tag, I95-9YN, forcing the woman driver from the vehicle at gunpoint. The black motorcycle was subsequently recovered by law enforcement at the scene of the crash.

The 2005 green Toyota Corolla, bearing Florida tag I95-9YN, was found abandoned a short time later in West Palm Beach, Florida, near the intersection of Westgate Avenue and Suwanee Drive, approximately 100 yards northeast of 2413 Hiawatha Avenue, West Palm Beach, the residence later determined to be that of Clifford S. Davis.

Law enforcement officers obtained the vehicle identification number (VIN) from the black motorcycle. A search of Florida Driver and Vehicle Information Database (DAVID) for VIN number, JS1GN7CA852109034, revealed that the motorcycle was registered to Elvira Vessi Ramos, of Belle Glade, Florida. Ramos was interviewed at her residence by agents and stated that the motorcycle was owned by her daughter, Denise Ramos. Elvira Ramos reported that her daughter, resides at 2413 Hiawatha Avenue, West Palm Beach, Florida. Elvira Ramos also

2

reported that she had seen Clifford S. Davis, Denise Ramos' boyfriend, at Davis and Ramos' residence approximately three weeks prior.

Law enforcement officers and agents responded to 2413 Hiawatha Avenue, West Palm Beach, Florida. Agents made contact with two neighbors of Denise Ramos. Neighbor 1 observed two individuals riding a black motorcycle on September 14, 2010 between 9:00 and 10:00 A.M. The motorcycle passenger was seen wearing a dark colored backpack. Neighbor 1 observed the motorcycle with the two riders traveling west on Hiawatha Avenue.

Agents made contact with a second neighbor of Denise Ramos. Neighbor 2 reported that on September 13, 2010, between 5:00 and 6:00 P.M., Davis and an unknown Hispanic male approached the neighbor about purchasing the neighbor's motorcycle. Davis and the unknown Hispanic male did not purchase the neighbor's motorcycle because it did not have a working battery. After being shown Davis' Florida driver's license photograph, neighbor 2 positively identified Clifford S. Davis as one of the two men inquiring about purchasing his motorcycle. Neighbor 2 also observed Davis and the unknown Hispanic male riding on the black motorcycle belonging to Davis on September 13, 2010.

Agents then made contact with Denise Ramos at her residence in the presence of her attorney, provided written consent to search the residence. During the course of the search of the home, numerous clothing items and a blue Motorola cellular phone were located in the residence.

Clifford S. Davis made contact with law enforcement agents through attorney Franklin Prince. Davis advised the agents that he was in Orlando, Florida. Davis said he was injured as a result of the motorcycle crash and also indicated that he wished to turn himself into authorities. Davis advised law enforcement agents that the small semi-automatic gun used during the bank

3

robbery was buried in the backyard area of the residence at 2413 Hiawatha Avenue. Agents recovered a black Smith and Wesson, Model 908, 9mm handgun, with serial number VKM1441 from the backyard. The handgun was found with a loaded magazine and had one round in the chamber of the gun.

On September 14, 2010, Clifford S. Davis met agents in West Palm Beach, Florida and was placed under arrest. In the presence of his attorney, Davis was advised of his Miranda rights. Davis signed a written waiver of those rights and was interviewed. Davis also signed a written consent to search for his cellular phone, a Boost Motorola telephone, number (561) 889-8463.

Davis admitted to robbing the Chase Bank on September 14, 2010. Davis stated he committed the robbery along with Barbara, an employee of the Chase Bank branch that was robbed, Gabe, the boyfriend of Barbara, and "Cino". Davis, Gabe, and Barbara met on the evening of September 13, 2010 at Barbara's apartment to discuss and plan the robbery. Barbara told Gabe and Davis that a large business deposit had been made and would be in the bank on the morning of September 14, 2010. During the planning for the robbery, Barbara gave instructions to Davis regarding how the door locks in the bank operated. The three individuals also discussed roughing up Barbara during the commission of the robbery. On the morning of September 14, 2010, Mercado, Davis and "Cino" met in a church parking lot near Davis' residence. "Cino" was driving a dark colored Dodge Neon. During the meeting it was decided that "Cino" was to remain in the vicinity of the bank in his vehicle during the robbery.

On the morning of September 14, 2010. Barbara sent Gabe a text message giving the group a time frame for the robbery to occur on that morning.

4

Davis subsequently drove the black motorcycle to the bank with Gabe as a passenger on the motorcycle. Both Davis and Gabe were armed with handguns. Upon approach to the bank, Gabe exited the motorcycle and opened the rear door of the bank for the motorcycle to enter. Once inside the bank, Gabe grabbed Barbara and directed her to open the door to the rear area of the bank. Once in the back area, Barbara directed another bank employee to open the vault. With the vault open, the bank employee removed two bags of currency. Gabe dropped a black backpack to the ground, and Barbara placed one of the two bags of currency in the backpack. Upon Gabe exiting the vault with the money, Davis and Gabe fled on the motorcycle.

Davis and Gabe crashed the motorcycle a short distance from the bank, and as Davis was attempting to restart the motorcycle, Gabe approached a white female in a green Toyota vehicle. Gabe ordered the white female from her vehicle at gunpoint and then entered the driver's seat. Davis then entered the passenger seat of the vehicle. Davis and Gabe traveled in the stolen vehicle and crashed or abandoned the vehicle approximately 100 yards north of Davis' residence.

After fleeing from the vehicle, Mercado and Davis ran to Davis' residence where they met up with "Cino". Davis buried the gun he had used in the robbery in the backyard. The three then went to Mercado's residence. Davis was paid approximately $20,000.00 for his role in the robbery as the motorcycle driver. Davis watched as Mercado and "Cino" spoke in Spanish and both men placed the money from the bank robbery in the ceiling area in the kitchen of the apartment, after Davis was paid. Davis knew "Cino" to live in West Palm Beach off of Military Trail behind Sugar Daddy's. He described "Cino" as a Hispanic male from Puerto Rico, approximately 5'7", medium build who wears his chin length hair in a ponytail.

A search of Davis' Boost Motorola phone contact list contained an entry titled, "Gabe" with phone number, (561) 667-0439. A database search for the target number, (561) 667-0439, revealed the number to be associated with Juan Gabriel Mercado, date of birth, 06/29/1981, with the address, 6202 Sherwood Glen Way, Apartment 2, West Palm Beach, Florida.

Agents showed Davis a Florida driver's license photograph of Juan Gabriel Mercado, date of birth 03/29/1981. Davis positively identified Mercado as Gabs, the person with whom he committed the September 14, 2010 bank robbery and car jacking.

On the morning of September 15, 2010, Barbara Hauck gave agents consent to search the residence she shares with Juan Gabriel Mercado at 6202 Sherwood Glen Way, Apartment 2, West Palm Beach, Florida. Hauck led agents to a drop ceiling in the kitchen area where agents found approximately $124,000 in U.S. currency. Hauck also directed agents to an air-conditioning vent in the bathroom where a black 9mm pistol was secreted. Hauck stated that the weapon belonged to Juan Mercado.

On September 15, 2010, Barbara Hauck was interviewed by law enforcement personnel at her residence during a consensual encounter. Hauck confessed that she had been involved in the planning and eventual bank robbery of Chase Bank on September 14, 2010 with Juan Mercado and Clifford Davis.

Barbara Hauck voluntarily stated to agents that Juan Mercado had discussed with her plans to commit bank robbery on several occasions.

Barbara Hauck voluntarily advised that an individual known to her as "Cino" was contacted by Juan Mercado. Mercado arranged for "Cino" to dispose of the clothing utilized in the robbery of Chase Bank on September 14, 2010 for which he would be paid a sum of money.

6

On September 17, 2010, based upon vehicle description, physical description and residence information provided by Davis, Abraham Figueroa was interviewed at his residence, 619 Neptune Street, West Palm Beach, Florida. Figueroa gave agents consent to search his residence. Figueroa confessed to receiving $1000 from Mercado for disposing of the helmets and clothing used in the robbery of Chase Bank on September 14, 2010 as well as the license plate from Davis' motorcycle. Figueroa took agents to a dumpster located at 2309 NW 9th Street, Fort Lauderdale, Florida where he stated he dumped the items. The dumpster had just recently been emptied. Figueroa told agents he spent $100 at the Isles Casino and the rest on rent and groceries. Figueroa stated he threw the motorcycle license plate off the third story of a parking structure at the Isles Casino. Agents recovered the license plate from Davis' motorcycle, utilized in the robbery of the Chase Bank of September 14, 2010, near where Figueroa had told them he had discarded it.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

Date: 11/10/10     By: _____
                        ROBERT H. WATERS, JR.
                        ASSISTANT UNITED STATES ATTORNEY

Date: 11/8/10      By: _____
                        FRANKLIN PRINCE
                        ATTORNEY FOR DEFENDANT

Date: 11/8/10      By: _____
                        CLIFFORD S. DAVIS
                        DEFENDANT

7